## YOUNGQUIST v. C. H. BLOMSTROM MOTOR CO.

CONTRACTS—BREACH—DISCHARGE—SALES.

A complainant who has failed to perform his part of a contract to advance money needed for the invention and patenting of motors, and who consented to the subsequent abandonment of the enterprise and the substitution of a third party in his place, cannot enforce a clause in the agreement giving him a half interest in the invention, against a corporation formed by others to carry on the manufacture of the motors.

Appeal from Wayne; Donovan, J. Submitted June 11, 1909. (Docket No. 65.) Decided November 5, 1909.

Bill by Orrin G. Youngquist against the C. H. Blomstrom Motor Company, C. H. Blomstrom, and Nathan M. Kaufman to establish an interest in defendant corporation. From a decree for complainant, defendant Blomstrom appeals. Reversed, and bill dismissed.

*Bowen, Douglas, Whiting & Eaman,* for complainant.

*Oscar M. Springer,* for appellant.

Moore, J. Prior to, and in October, 1900, the complainant was a practicing physician living at Marquette, Mich. His cousin, the defendant Charles H. Blomstrom, was also a resident there. Mr. Blomstrom was the designer and general manager of the Lake Shore Engine Works. During his leisure time he was engaged inventing and constructing an automobile. A written contract was entered into, the material parts of which are as follows:

"This agreement, made this twenty-seventh day of October, in the year of our Lord one thousand nine hundred, by and between Charles H. Blomstrom, of the city and county of Marquette and State of Michigan, party of the first part, and Orrin G. Youngquist, of the same place, party of the second part, witnesseth: That said party of the first part, for and in consideration of the advances to be made from time to time as needed, by said party of the second part, for the purpose of defraying the expenses attendant upon the work of construction of a model and procuring patent or patents upon a self-propelling vehicle, machine, or automobile, which said party of the first part hereby undertakes to invent, devise, construct and manufacture, hereby bargains, promises, covenants, and agrees to assign, transfer, set over, and convey by good, proper, and sufficient conveyance or bill of sale, unto said party of the second part the undivided forty-nine one-hundredths interest in and to any patent or patents which said party of the first part may obtain or procure upon or in any way or manner covering any and every portion, part, feature, section, or division whatsoever of said invention, and in and to any patent or patents which said party of the first part may obtain or procure upon or in any way or manner covering or affecting any combination whatsoever of any and every such portion, part, feature, section, or division of said invention, and to account to and pay over to said party of the second part a like interest and share of any receipts, proceeds, or income arising from the manufacture and sale of said invention, machine, self-

propelling vehicle, or automobile; and said party of the second part hereby promises and agrees to make the advances of money and funds above-mentioned accordingly; it being the intention, under-standing, and agreement of the parties hereto that said party of the first part is to furnish all the mechanical skill and perform all the labor and work, or procure the same to be performed, requisite and necessary to perfect, com-plete, construct, and successfully operate the aforesaid self-propelling vehicle, machine, or automobile, and so properly describe, manipulate and operate the same that patent or patents shall be granted, covering said invention in all its parts, portions, features, sections, and divisions, and that said party of the second part is to furnish and advance all the money and funds which shall be required for that purpose. It is further hereby mutually under-stood and agreed by and between said parties that neither of said parties shall have the right to sell, assign, transfer, dispose of, or in any way or manner alienate the whole or any part of his interest in said invention, patent or pat-ents, or sell, assign, transfer, dispose of, or in any way or manner attempt to incumber or hypothecate the whole or any portion of his proper and equitable interest in the shares of stock of any association, company or corpora-tion which they, or either of them, may organize or pro-mote for the manufacture and sale of said invention, pat-ent or automobile, without the consent of the other of said parties hereto first obtained in writing. It is also further mutually understood and agreed by and between said parties that this contract shall and does cover, include and operate upon any and all points, parts, features, portions, sections and divisions whatsoever of the self-propelling vehicle, machine, or automobile already constructed or in process of construction, by said party of the first part."

In July, 1901, Mr. Blomstrom sold a one-half interest in the automobile he was constructing, and his designs and rights in relation thereto, to Nathan M. Kaufman. In September, 1901, Mr. Blomstrom sold to Nathan M. Kaufman a one-half interest in the following inventions: (a) Improvements in wheel hubs. (b) Improvements in propeller mechanism for boats. (c) Improvements for vaporizers for internal combustion engines. (d) Improve-ments in motor vehicles. The latter part of 1901 Mr.

Blomstrom moved to Detroit, and, with Mr. Kaufman, under the name of the Blomstrom Motor Company, engaged in the business, principally, of making launches, though some automobiles were made. In October, 1904, a corporation was formed, called the C. H. Blomstrom Motor Company, with a capital of $100,000. Its purpose was stated as follows:

"Article 11. The purpose or purposes of this corporation are as follows: to manufacture, buy and sell, at wholesale or retail, marine, stationary, and other gas and steam engines, boats, automobiles, pumps, and any other machinery or implements to be run by gas or steam engines."

Its stockholders were as follows: Charles H. Blomstrom, Detroit, Mich., 2,500 shares; Samuel R. Kaufman, Marquette, Mich., 1,000 shares; Nathan M. Kaufman, Marquette, Mich., 6,500 shares. In September, 1906, the bill of complaint in this case was filed. The case was put at issue and tried. A decree was rendered in favor of complainant, the important part of which is as follows:

" That said defendant the C. H. Blomstrom Motor Company forthwith execute and issue to said complainant 49 per cent. of 5,000 shares of its capital stock of the par value of $10 per share, or the certificate or certificates for 2,450 shares of its capital stock of the par value of $10 each; that said 2,450 shares of stock be charged against the amount of stock credited in the articles of association to said defendant Charles H. Blomstrom, and that said defendant company, the C. H. Blomstrom Motor Company, issue to said defendant Charles H. Blomstrom certificate or certificates for 550 shares of stock of said defendant company."

The defendant Blomstrom has brought the case here by appeal.

The pivotal position of the solicitors for complainant is stated in their brief as follows:

" The principal question involved in this appeal is whether or not the complainant is entitled under the con-

tract to the relief granted by the court below, and this question is answered affirmatively if our interpretation of the contract is correct. Our contention is that it was absolutely necessary by the terms of the contract to secure the written consent of either party to any transfer of interest of either party to the contract, and the purpose of the contract was to prevent just such a thing as has happened here. If this court were to sanction an act of this kind, it would place a premium upon the violation of contracts. The purpose of the contract was to prevent either party from being crowded out of the enterprise by the other one. With that end in view, it was provided that the consent in writing would have to be obtained before either party could dispose of his interest to an individual or a corporation. The contract provides:

"'That neither of said parties shall have the right to sell, assign, transfer, dispose of, or in any way or manner alienate the whole or any part of his interest in said invention, patent, or patents, or sell, assign, transfer, dispose of, or in any way or manner attempt to incumber or hypothecate the whole or any portion of his proper and equitable interest in the shares of stock of any association, company, or corporation which they, or either of them, may organize or promote for the manufacture and sale of said invention, patent, or automobile, without the consent of the other of said parties hereto first obtained in writing,'

"Now, if that contract means what it says, then the decree of the circuit judge should be upheld, for it is undisputed that the written consent of Youngquist to the sale of any interest under the contract to Kaufman was never given."

There would be no flaw in this contention if the complainant had fulfilled his part of the contract, and had not consented to a different arrangement, which consent was acted upon. It is the contention of Mr. Blomstrom that complainant never carried out his part of the contract, and that he consented to Mr. Blomstrom's entering into relations with Mr. Kaufman that made it impossible for the terms of the contract to be met. It is agreed that all that was paid by complainant was $200. The defendant claims that the actual expenditures prior to July, 1901, amounted to nearly $800, and that the bills for these

amounts were presented to the complainant for payment, and that he did not pay them.  There is conflict in the testimony, and it is urged that because of what was done when the articles of association were drawn, that Mr. Blomstrom is shown not to be entitled to belief.  His testimony is in part as follows:

"No patents were ever issued upon the machine or any part of the machine that I was working on in Marquette at the time I made the contract with the complainant. * * * Exhibits 11, 12, 13, 14, and 26 are bills for materials used in the construction of that machine.  I was not working on any other automobile at that time.  I took these bills to Dr. Youngquist.  When I called upon the doctor the first time, I presented bills for $250, or in that neighborhood, and he gave me $100 on account.  He gave me $100, and then, when the bills ran up to about $500 or $600, I presented them again, and told him what we owed, and he gave me another hundred dollars, with the understanding that it was taking more money than he thought, that he would not be willing to go ahead any further.  He said: 'It is going to take a lot of money. I can see it takes lots of money to build automobiles.' And he wanted to know how much more it would take, *et cetera,* and I told him.  I gave him an idea, and he says, 'if you can get somebody else,' he says, 'you can count me out.'  That was in the spring of 1901.  I would say along in February.  I showed these bills to Dr. Youngquist, all of them.  I saw him about these bills six or seven times between November, 1900, and the spring of 1901, but I did not get any money. * * * When I would go with the bills, he would say come next week or something to that effect. * * * All these bills were contracted on the car represented by the photographs. Before making any arrangements with Mr. Kaufman, I had a conversation with Dr. Youngquist at the post office in Marquette July 4, 1901, and told him 'that I can make an arrangement with Mr. Kaufman, who is willing to furnish all the money up to half a million to carry on the business.'  And he says:  'Well, all right, go ahead, and count me out.'  I went to see him at that time to see if he was willing to go ahead any farther with the contract or drop it.

"*The Court:* How many dollars were due then on the bills?

"*A.* Approximately $600.

"*Q.* What did you talk about the $200 paid in there?

"*A.* Nothing said, only he said: ' I am willing to lose just what I have put in.' * * * After my conversation with Dr. Youngquist I saw Mr. Kaufman the next day, and closed with him, made a contract in writing. I told Dr. Youngquist about making this contract. I met the doctor, and he asked me if I had closed the deal, and I told him I had, and he wanted to know if I got any money, and I told him I got $300 from Mr. Kaufman. The doctor seemed pleased and satisfied. He said: ' I realize it takes ·more money than I have got, and Mr. Kaufman has got it, and you will be able to go ahead in good shape.' Then I started out to get patents; made applications for patents. I did not make application before because I had no money. These were the applications referred to here on wheel hubs and motor vehicles. I had asked the doctor for money to make applications for these things. He said he would pay. He said ' wait a week or two,' or something to that effect—just put me off from time to time. I started the next day after I made a contract with Kaufman to make applications for patents, wrote to Pierce & Fisher, patent attorneys, in Chicago. About a month after that, I resigned my position and came to Detroit, went into the business of building boats and engines, and continued that business for about two years. The engines were marine engines, for marine purposes only. When I made the contract with Mr. Kaufman, it was understood I was going to Detroit to manufacture engines and automobiles, and I came down here after that and established the business under the name C. H. Blomstrom Motor Company. I told the complainant I was coming to Detroit because it was the best city I knew of. After I closed with Kaufman, I remained in Marquette about three months, and I saw the doctor nearly every day, and then met him twice since then, or three times to my knowledge, once in Marquette, once in Chicago, and once in Detroit. I met him in Marquette the February following my coming to Detroit."

His testimony was that the complainant never made any claim upon him until after the corporation was formed, unless two letters which he received by due course of mail might be regarded as a claim. The letters are as follows:

A letter dated March 26, 1906, on the letter head of O. G. Youngquist, M. D., which reads as follows:

"March 26th, 1906.

"Charles H. Blomstrom,

"Detroit, Mich.

"*Dear Cousin:* As the time is drawing near to use automobiles, I feel that you will be willing to construct me a late model two seater for the money I have advanced, interest and help given you. Don't you think that is about right. It will prove a good advertisement up here for you. Please let me know if you will do this. With best wishes,

"Your cousin,

"O. G. Youngquist."

A letter dated April 7, 1906, on the letter head of O. G. Youngquist, M. D., which reads as follows:

"April 7, '06.

"Charles H. Blomstrom,

"Detroit, Mich.

"*Dear Cousin:* Have been waiting to hear from you regarding that automobile. Now can you not build me a good car; you'll never lose by doing it. Time for running them is drawing near.

"Yours truly,

"O. G. Youngquist."

It is contended by complainant that he did not write these letters, but they were written by his office associate, Dr. James. He admits writing the following:

"Marquette, Mich., April 16th, 1906.

"C. H. Blomstrom,

"Detroit, Michigan.

"This note will introduce Mrs. Mack. Anything you can do for her will be greatly appreciated by me. Care Queen Automobile Works.

"Respectfully yours,

"Dr. O. G. Youngquist.

"( Let me hear from you )."

It is the testimony of defendant that all the letters were written by complainant. On the cross-examination complainant answered in part as follows:

"*Q.* Do you mean to say you did not see any bills except those which the checks of $200 paid?

"*A.* That is all I saw to my knowledge. * * * I never saw an itemized bill like that at all. He brought some bills to the office, a shipping bill or something. I could not recollect what it was for, and I do not recollect when that was. I do not remember Blomstrom bringing bills to me but once, and that was in my office. I do not recollect Mr. Blomstrom ever speaking to me about indebtedness he had incurred in trying to develop this machine.

"*Q.* Do you say he did not?

"*A.* I say I do not remember that he did. I heard about Blomstrom entering into a business arrangement with Mr. Kaufman, but I do not remember when it was. I think it was in 1901. I do not know positively.

"*Q.* Now, before Mr. Blomstrom left (Marquette), did you hear or know in any way that he had entered into some business arrangement with Mr. Nathan Kaufman?

"*A.* I heard it in some way.

"*Q.* Now, let me refresh your recollection, Doctor. On or about the 4th day of July, 1901, do you recollect Mr. Blomstrom coming to you in the post office?

"*A.* No, sir; I do not.

"*Q.* And telling you that he had or was about to enter into an arrangement with Mr. Kaufman by which Mr. Kaufman was to furnish a large sum of money with which to engage in the business of manufacturing of boats and boat machinery, and so forth?

"*A.* No, sir; I do not remember anything of the kind.

"*Q.* And did you advise him to do it, that you did not have money enough?

"*A.* No; I do not remember anything of the kind.

"*Q.* Do you say nothing of that kind occurred?

"*A.* I would not say for sure. I do not remember.

"*Q.* You say you do not remember.

"*A.* Yes, sir. * * *

"*Q.* How early did you suppose that Nate Kaufman was interested in the business?

"*A.* I had heard of his name about the time Blomstrom left Marquette, that he was in business with him. I never asked Mr. Kaufman about it, nor Blomstrom, that I know of. I may have written Blomstrom after he left Marquette. I once wrote him, and wanted a folder or catalogue of their machines. I thought at one time I would buy a machine. I saw Blomstrom after he left Marquette

in 1901 at one time in Chicago. I have forgotten the year.

"*Q.* It was after he left Marquette, and before you came to Detroit?

"*A.* Yes, sir; I think it was.

"*Q.* Did you talk with him about the business that he was doing here?

"*A.* He was talking about automobiles, and everything was prospering, doing nicely.

"*Q.* Did he tell you how they were getting along down here?

"*A.* Yes, sir; he said they were getting along all right, as near as I could understand it.

"*Q.* That was about all the talk that there was there?

"*A.* About all that I can remember. I did not pay much attention to it.

"*Q.* You did not pay much attention to it at that time?

"*A.* No, sir. * * *

"*Q.* Did anybody tell you that no patents issued to Mr. Blomstrom on any of these applications?

"*A.* I did not know anything about the business at all.

"*Q.* So that when you filed this bill, Doctor, in 1906, is that the first time that you made any claim of any interest in these patents to Blomstrom?

"*A.* Yes, sir; I think it was. But, when I was here I tried to contract for an automobile from Blomstrom, I tried to get him to send me an automobile.

"*Q.* What for?

"*A.* To use.

"*Q.* Did you buy one?

"*A.* Well, there was nothing said about any price or anything of the kind.

"*Q.* But you simply negotiated the purchase, or of getting one in some way—one of the machines?

"*A.* Yes, sir. * * *

"*Q.* Where is the doctor that you speak of?

"*A.* In Marquette. Mr. James was not my partner. He was associated with me.

"*Q.* Do you recall the fact that the letters, having been written, that they were written at the time they were written?

"*A.* No, sir; we were talking about this affair.

"*Q.* Did you talk with your associate?

"*A.* I told him all about the affair. I presume I told him that I had advanced or paid in $200. I do not know

positively whether I did or not tell him just the amount.

"*Q.* Did you tell the doctor that you thought it would be all right if Blomstrom would give you an automobile?

"*A.* Possibly I did.

"*Q.* Is that the way you felt about it?

"*A.* I cannot answer it. I do not know how I felt at that time."

Witness further testified that he only claimed to have invested $200, and said that, irrespective of any business complications with Mr. Kaufman or anybody else, he claims 49 per cent. of the stock of the corporation organized by Blomstrom and Kaufman; that he did not know what the stock is worth, had made no inquiry about it, and did not know that it was worth anything; that he made no inquiry into the nature of the business or assets of the partnership or the concern of C. H. Blomstrom & Company that he remembered of; that he did not know that Blomstrom and Kaufman, after Blomstrom came to Detroit, engaged in the manufacture of marine engines; that he heard that they were making boat engines, but when he could not remember. Witness further said:

"I have never talked with Mr. Kaufman upon this subject at all. * * *

"*Q.* Now, you put $200 in this thing, I understand?

"*A.* Yes, sir.

"*Q.* How much are you ready and willing to put in now, under that contract?

"*A.* All I was asked for to build a machine.

"*Q.* Suppose it had been $50,000, would you have done it?

"*A.* No, sir.

"*Q.* Would you have done it if it had been $20,000?

"*A.* No; I would not.

"*Q.* Would you have put in $500 in this business at that time if Blomstrom had asked you?

"*A.* I do not know. I would not put in any more money than I did, for the simple reason Blomstrom told me it would cost me from $200 to $300. I would have to possibly put in another hundred to fulfill my part of it. I could not tell now what I would have done if it had been put up to me then. I do not know what I would have done. I am testifying from my present standpoint.

"*Q.* You do not know what you would have done ?
"*A.* No, sir."

It is a significant fact that Dr. Youngquist put only $200 into the venture, and that the record fails to disclose that he has ever offered to pay any other amount, while there is no question that the necessary expenses have been many times this amount. The testimony of the complainant, which we have quoted, what he did and what he omitted to do, is not consistent with the claims made in the bill of complaint, but tend to corroborate the testimony of defendant. There is much conflict in the testimony, but it establishes by a preponderance of the testimony the version of the defendant as to the business relations of the parties.

The decree is reversed. One may be entered here dismissing the bill of complaint, with costs of both courts.

GRANT, MONTGOMERY, OSTRANDER, and HOOKER, JJ., concurred.